# UTAH-IDAHO SUGAR CO. v. SALT LAKE COUNTY
## et al.

No. 3694. Decided September 16, 1922. (210 Pac. 106.)

1. APPEAL AND ERROR—WHEN FINDINGS ASSAILED, COUNSEL MUST POINT OUT PARTICULARS IN WHICH THEY ARE NOT SUPPORTED BY EVIDENCE. While it is permissible to group assignments of error, yet, when the findings of fact are assailed, and in the nature of things cannot all, or even a large portion thereof, be contrary to the evidence, counsel must in the brief point out in what particulars the findings are not supported by the evidence, in order that the court may know what points are relied on, and where it may look in the record for the evidence, or lack of evidence, with respect thereto.

2. TAXATION—FRANCHISE TO BE CORPORATION NOT TAXABLE. Under Const. art. 13, § 2, requiring all property, including moneys, franchises, etc., to be taxed, the franchise to be a corporation is not taxable property, but can only be reached by a license tax.[1]

3. TAXATION—DOCTRINE OF UNITY OF USE CANNOT BE APPLIED TO MANUFACTURING PLANTS IN DIFFERENT STATES, BUT UNDER COMMON OWNERSHIP. The doctrine of unity of use applied in assessing property of interstate railways and express companies and in apportioning their property between different states cannot be justly and equitably applied to manufacturing or other similar plants or industries used or operated in different states, and entirely independent of one another, though under common ownership.

4. TAXATION—GOOD WILL, EARNING CAPACITY, ETC., CAN ONLY BE CONSIDERED AS ENHANCING VALUE OF TANGIBLE PROPERTY. While under Const. art. 13, §§ 2, 3, the good will, earning capacity, productiveness of property, etc., enhancing or influencing the value of tangible property, may be taxed, they may only be taxed by considering them in arriving at the actual value of tangible property, and may not be separately assessed as intangible property or "other personal property."

5. TAXATION—STATE MAY LOOK BEYOND ITS BORDERS ONLY TO OB-

---

[1] *Black Rock Copper M. & M. Co.* v. *Tingey*, 34 Utah, 369, 98 Pac. 180; *International Smelting Co.* v. *Tooele County*, 54 Utah, 591, 182 Pac. 841.

TAIN TRUE VALUE OF WHAT IS WITHIN ITS BORDERS. While, in taxing the property of a foreign corporation which is in the taxing state, such state may look beyond its borders, it may only do so to obtain the true value of the property in the taxing state.

6. TAXATION—ASSESSMENT OF INTANGIBLE PROPERTY, SO FAR AS BASED ON FACTORIES AND PROPERTY IN OTHER STATES, HELD INVALID. An assessment of so-called intangible property of a corporation having its home office in the county where the assessment was. made, consisting of. good will, earning capacity, productiveness of the property, etc., *held* in excess of the jurisdiction or authority of the assessor or board of equalization, so far as it was based on factories and property used in connection therewith situate in other states.

7. TAXATION—INTANGIBLE PROPERTY, IF TAXABLE, MUST BE TAXED WHERE USED IN CONNECTION WITH TANGIBLE PROPERTY. If so-called intangible property, consisting of good will, earning capacity, productiveness of property, etc., is taxable separately, and independently and apart from the tangible property out of which it arises, it must, under Const. art. 13, § 10, be taxed at the place where it is used in connection with the tangible property.[2]

8. TAXATION—ASSESSMENT OF COMPANY'S INTANGIBLE PROPERTY IN COUNTY CONTAINING HOME OFFICE HELD INVALID. Assuming that a corporation's so-called intangible property, so far as it arises out of property owned and used in other states, has a situs for taxation in the ·county in which it has its home office, an assessment on so much thereof as arises out of property owned and used in other counties may be legally assessed only in such counties, and the assessment when made in a lump sum fails for want of any method by which the value of such property arising out of tangible property in other states can be segregated from that in other counties.

9. TAXATION—INTANGIBLE PROPERTY CANNOT BE ASSESSED IN LUMP SUM AND APPORTIONED AMONG COUNTIES. Under Const. art. 13, § 10, the authorities of each county must assess property therein for taxation, and where a corporation owns factories and tangible property in connection therewith in different counties, its so-called intangible property if subject to taxation, cannot be assessed in a lump sum and then apportioned among the several counties.

---

2 *Murdock* v. *Murdock*, 38 Utah, 373, 113 Pac. 330.

Appeal from Third District

10. TAXATION—CONSTITUTION VIOLATED BY ASSESSING INTANGIBLE PROPERTY OTHERWISE THAN AS IT ENHANCES VALUE OF TANGIBLE PROPERTY. Under Const. art. 13, § 3, requiring uniform taxation, the so-called intangible property of a corporation ascertained by deducting the estimated value of its intangible property from the total value of its capital stock cannot be taxed otherwise than as it enhances the value of tangible property.

11. TAXATION—ASSESSOR MAY NOT ASSESS PROPERTY IN OTHER COUNTIES OR STATES OF CORPORATION HAVING HOME OFFICE IN HIS COUNTY, BECAUSE NOT ASSESSED AT FULL VALUE. The assessor of a county in which a corporation has its home office, after determining to his own satisfaction that assessors in other counties and states in which it owns property have not assessed it at its full cash value, cannot assess the property which they have failed to assess.

12. TAXATION—UNAUTHORIZED ASSESSMENT NOT LEGALIZED BECAUSE OF LIABILITY OF ALL PROPERTY TO TAXATION. That it is the duty of the assessor to assess all taxable property at its value, and the duty of every owner of taxable property to list it for taxation, cannot make legal an unauthorized assessment.

13. TAXATION—IRREGULARITIES IN ADDITIONAL ASSESSMENT HELD NOT TO RENDER IT ILLEGAL AND INVALID. Where an additional assessment against the owner of a manufacturing plant, though made after an assessment of its plant and machinery, and designated as "other taxable property" or "personal property not otherwise enumerated," was intended to be an additional valuation of the plant and machinery, and was a fair and reasonable value thereof, and not in excess of its actual cash value, the irregularities in the assessment and the error of the board of equalization, if any, in upholding it do not make the tax illegal and subject to injunction under Comp. Laws 1917, §§ 6087, 6093.

GIDEON and WEBER, JJ., dissenting in part.

Appeal from District Court, Third District, Salt Lake County; *J. Louis Brown*, Judge.

Action by the Utah-Idaho Sugar Company against Salt Lake County and others. From a decree granting part of the relief asked, both parties appeal.

AFFIRMED.

*King, Straup, Nibley & Leatherwood* and *Young & Boyle,* all of Salt Lake City, for respondent.

*Arthur E. Moreton,* Co. Atty., *Geo. G. Armstrong,* Asst. Co. Atty., and *Richards & Mitchell,* all of Salt Lake City, for appellants.

FRICK, J.

The Utah-Idaho Sugar Company, a corporation, hereinafter called plaintiff, brought this action in the district court of Salt Lake county against Salt Lake county and the individuals named as treasurer, assessor, auditor, and the three county commissioners of said county hereinafter designated defendants, to enjoin them from collecting a certain tax, which was assessed against the plaintiff and which plaintiff alleged was illegal and void. The district court enjoined the defendants from collecting a portion of the alleged illegal tax, and refused to enjoin the collection of a certain portion as will hereinafter more fully appear. The defendants appealed to this court from that part of the judgment which enjoins them from collecting the tax as aforesaid, while the plaintiff appealed from that part on which an injunction was denied. The appeal was duly submitted to this court and a decision was handed down, in which by a divided court (Mr. Justice Thurman dissenting) it was held that, while the whole of that part of the tax which the district court enjoined was a legal tax, yet that only a part thereof was legally collectible by Salt Lake county, and that that part which the court had refused to enjoin was legally collectible by said county. As to the first part, therefore, the judgment was in part reversed by this court, while as to the second part it was affirmed. The plaintiff in due time filed an elaborate petition for a rehearing. Defendants joined issue thereon, and also prayed that they be given a rehearing on the proposition that the whole tax was collectible by Salt Lake county. The different members of the court entertained serious doubts respecting the correctness of the decision as handed down, and therefore

a rehearing was granted, and the whole case was reopened for argument. The case was most elaborately argued by both sides in oral arguments, and by additional briefs, and was again submitted. A majority of the court being now of the opinion that the former decision should not be adhered to, this decision is substituted therefor.

In view that the findings of the district court fully reflect the pleadings and issues, together with the evidence, we have deemed it more convenient to merely set forth the findings somewhat in detail, instead of referring to the pleadings. The assignments which assail the findings will be referred to in the course of the opinion wherever deemed necessary. In view that the findings are very lengthy and go into great detail, we shall state them in condensed form only. For more convenient reference we shall retain the original numbering of the paragraphs of the findings. The court found:

(1)   That plaintiff is a corporation of the state of Utah, and that it was also doing business in the states of Idaho, Oregon, Washington, and Nevada in the production, manufacture, and sale of beet sugar, and that it maintained its general office at Salt Lake City, Utah.

(2)   That at all times stated in the complaint and on the 1st day of January, 1918, and prior thereto, plaintiff owned and operated sugar factories at the following places: Lehi, Payson, and Spanish Fork in Utah county; Garland, in Box Elder county; Elsinore, in Sevier county, and West Jordan, Salt Lake county, all in the state of Utah; that it also owned and operated factories at Idaho Falls, Sugar City, Blackfoot, and Shelley in the state of Idaho; also one at Grant's Pass, Or., one at Sunnyside and another at North Yakima, state of Washington. The only factory owned and operated by the plaintiff in Salt Lake county was the one at West Jordan.

(3)   That at all times stated plaintiff maintained offices in all of the counties aforesaid in the state of Utah in connection with its said factories, and, also maintained offices in connection with its plants in the states of Idaho, Oregon, and Washington; that comparatively only a small part of its business and operations was carried on in Salt Lake county, and

that by far the greater part of plaintiff's assets and property was in counties of the state of Utah other than Salt Lake county and in states other than the state of Utah.

(4) That on the 1st day of January, 1918, plaintiff owned real estate and improvements thereon in Salt Lake county; that plaintiff's said real estate and improvements in said county were assessed at the value of $271,575, and valuation notices of said assessment were given plaintiff, in which notices the valuation was given as stated above; that said valuation and assessment, including the real estate and plant at West Jordan, did not include the machinery, which was valued and assessed separately from the real estate and improvements; that plaintiff, for the year 1918, was also assessed for personal property in Salt Lake county, including the machinery aforesaid at West Jordan plant, at the total valuation of $420,505; that notices of said assessment and valuation were duly given to the plaintiff; that prior to the commencement of this action plaintiff had paid all of the taxes on the valuations and assessments aforesaid, amounting to $8,381.36.

(5) That after giving the valuation notices aforesaid and between the 1st day of May and the 1st day of June, 1918, the defendants, county assessor and county treasurer, gave or caused to be given the plaintiff two additional valuation notices, one for $10,000,000, in which the property valued and assessed was described only as "$10,000,000.00 personal property," and the other in the sum of $167,180, in which the property was described only as "intangible property at West Jordan factory"; that "no other description, enumeration or specification of property, either as to kind, character, or quality, was made or given; that upon inquiry by plaintiff of said assessor respecting said property he refused, or was unable, to give any further description except that said assessments were for "intangible property," but refused, or was unable "to give the nature or character of said intangible property."

(6) In this paragraph of the findings the facts are fully set forth with respect to the proceedings had before the Salt

Lake county board of equalization. Among other things the court found that plaintiff had made timely and repeated protests to said valuations and of said $10,000,000 and said $167,180 assessments, and demanded a cancellation thereof; that the plaintiff had no such property as was thus attempted to be valued or assessed either real or personal, in Salt Lake county, and that it had no other than the two items that were valued and assessed by the county assessor, to wit, real estate and improvements, $271,575 and personal property, including the machinery of the value of $420,505, making a total in said Salt Lake county of $692,080, and, specifically, that plaintiff had "no such property in Salt Lake county as was sought to be assessed for $167,180, or any part thereof, or for said $10,000,000 or any part thereof."

(7)    The court then found in detail the facts respecting the controversy between the parties with regard to the said two items of property and found that: The plaintiff proved before said board that it had "no tangible or intangible property of any kind in Salt Lake county on January 1, 1918, or for that taxing year," except what was contained and described in said valuation of $692,080, and that such was all the property plaintiff had in Salt Lake county. That the only claim upon which the defendants based the right to assess said $10,000,000 was "a printed annual statement of the plaintiff, which was a statement showing the financial condition of the plaintiff on the 28th day of February, 1918, and which was substantially the financial condition of the plaintiff on January 1, 1918. That a copy of said statement was admitted in evidence upon the trial, and reads as follows:·

ASSETS.

| | |
|---|---|
| Real estate, plants, canals, etc., less depreciation........ | $16,562,477 43 |
| Railroad spurs ..................................... | 89,306 30 |
| Irrigation stocks ................................... | 3,255 00 |
| Autos, horses, harness and farm equipment.......... | 98,285 58 |
| Furniture and fixtures............................. | 27,515 84 |
| Advance charges to operations...................... | 101,238 67 |
| Advances on contracts and new operations........... | 85,225 34 |
| Cash and convertible assets: | |
|    Cash ..............................$ 112,135 10 | |
|    Bills receivable ..................... 2,106,859 08 | |

| | | |
|---|---:|---:|
| Accounts receivable | 1,221,690 75 | |
| Stocks and bonds | 476,366 97 | |
| Mortgage loans | 536,513 49 | |
| Unpaid contracts and agreements | 538,997 44 | |
| Accrued interest receivable | 32,003 47 | |
| Sugar, molasses, and pulp | 3,429,860 30 | |
| Beet seed | 557,515 38 | |
| Prepaid on beet seed | 16,679 77 | |
| Supplies | 803,329 13 | 9,831,950 88 |

$26,799,255 04

### LIABILITIES.

| | | |
|---|---:|---:|
| Capital stock: | | |
| Authorized | $30,000,000 00 | |
| Unissued | 6,373,650 00 | 23,626,350 00 |
| Reserve for doubtful accounts | | 90,000 00 |
| Current liabilities: | | |
| Bills payable | 1,042,685 32 | |
| Accounts payable | 151,312 70 | |
| Income taxes payable | 367,823 90 | |
| Accrued interest payable | 4,852 20 | |
| Unpaid pay roll | 79,159 26 | |
| Freight and discount on sugar | 59,949 31 | |
| Sundries | 3,267 73 | |
| Total current liabilities | | 1,709,050 42 |
| Surplus | | 1,373,824 62 |

Total liabilities ...............................$26,799,225 04

That the assessor "through correspondence with various taxing authorities * * * had been informed and learned that the plaintiff in all the counties of the state of Utah, including Salt Lake county, and in all the states where it had real estate and plants and other property and did business, and in all the world for the year 1917 paid taxes on an assessed valuation of about $9,000,000, but inasmuch as it had in all the world total assets as shown by the said statement of over $26,000,000, the plaintiff was not paying a just proportion of taxes and hence the assessor and the said board claimed the right to assess the plaintiff as and for intangible property the difference between the said assessed value of $9,000,000 and the said total assets of over $26,000,000 which was more than $10,000,000."

(8)   That nothing was made to appear that the plaintiff

on January 1, 1918, or for that taxing year, in Salt Lake county "had property of any kind or description, either personal or real, or tangible or intangible in addition to the said $692,080.''

(9)   That in due time the treasurer of Salt Lake county "sent or caused to be sent to the plaintiff a tax notice of said assessments for $10,000,000, and demanded a total general tax thereon in the sum of $198,000; that the only description or enumeration, or specification of property with respect thereto was 'P. P. $10,000,000.00,' '' and that about the same time a tax notice was given plaintiff respecting said assessed valuation of $167,180 for ''intangible property at West Jordan,'' and demanded a tax thereon in the sum of $1,989.44.

(10)   The court then found that: The assessor was provided with an assessment roll, which was divided into columns. That there was one column in which to include the value of the real estate, another in which to state the value of the improvements thereon, another in which to state the value of live stock, and still others in which to state the value of merchandise, supplies, appliances, implements, tools, machinery, money, bonds, solvent credits, judgments, etc. That ''neither of the said assessments for the said $167,180 or the said $10,000,000 was incorporated or placed in or under any of the said columns upon the assessment roll, but on the assessor's blotter both were placed in the column of 'Other Taxable Property' and on the assessment roll in the treasurer's office both in the column of 'Personal Property Not Otherwise Enumerated.' '' That the West Jordan plant or factory in Salt Lake county on the assessment roll was described as follows:

"Value of real estate, $8,820.00; value of improvements, $237,000.00; supplies, $55,590.00; sugar, $107,200.00; raw material, $1,570.00; value of machinery, $237,000.00; office furniture, $2,000.00; value of other taxable property $167,080.00."

That on the assessment roll in the treasurer's office the same property was described as follows:

"Value of real estate, $8,820.00; value of improvements, $237,000.00; merchandise, $164,360.00; machinery, $237,000.00; personal property not otherwise enumerated, $167,180.00; total value

of personal property, $570,540.00; total value of all property assessed, $816,360.00."

(11)   The court further found that said $10,000,000 assessment was not made upon any real estate, or upon any other kind or character of property whatever situate and being in Salt Lake county, and that the assessment of $167,180 was not made upon any property "except on the machinery or plant at said West Jordan"; that the plaintiff, on the 1st day of January, 1918, or for said taxing year, "had no property in Salt Lake county, either real or personal, except the property mentioned and described in said valuation notices," amounting to $692,080, "and the plaintiff had no property in Salt Lake county of any kind in addition thereto or for which the said assessment of $10,000,000, or any part thereof, was made."

(12)   That "the total assets of the plaintiff in all the world for the year 1918 were shown to be over $26,000,000; the assessed value of its property in all the world, about $9,000,000; the authorized capital stock of the plaintiff $30,000,000; the issued par value of the capital stock, $23,626,350; the unissued par value of the capital stock, $6,373,650; the market value of the capital stock about $8.50 per share; the par value $10 a share; and thus the total value of the physical assets of the plaintiff for the year 1918 exceeded the market value of the issued stock by between $4,000,000 and $5,000,000."

(13)   That of all the property mentioned in the financial statement aforesaid none was in Salt Lake county except said $692,080; that of the stocks and bonds valued at $476,366.97, $400,000 were corporate stocks of the Layton Sugar Company at Layton, Utah, a Utah corporation, which stocks were not taxable; that of the property mentioned in said financial statement $52,339 was nontaxable governmental bonds and stamps; that $17,004 consisted of nontaxable stock of the United States Beet Seed Company, having its office in Salt Lake county; $2,500 was nontaxable stock in the Industrial Company, a Utah corporation; $1,807 was nontaxable stock in the Utah Conservation Company, a Utah corporation; $150 was nontaxable stock in another Utah corporation; that of the

item $536,513.49 in said financial statement $443,794 consti-
tuted mortgage loans in the state of Utah and not taxable in
this state; that the remainder of said loans, something over
$100,000, represented loans upon lands elsewhere, chiefly in·
·the state of Idaho, but no claim was made by any of the de-
fendants that either of the items mentioned was assessed as
mortgage loans, and neither of the assessments in dispute was
in fact made for mortgage or other loans; that the item of
$90,000 mentioned in said financial statement was worthless;
that the plaintiff had listed all of its property with the as-
sessor prior to said additional statements of $10,000,000 and
$167,180, which list was duly verified, and showed that the
accounts payable exceeded the accounts receivable, which fact
was not disputed by the defendants or any of them.

(14)   The court further found that—

The item of $167,180 which was assessed by the assessor sub-
sequent to the original assessment, "was intended by said assessor
* * * should be for and upon some property at the West Jordan
plant, and to be a part of the value of the machinery at said plant,
and though it was on the assessment roll placed in the column of
'Other Taxable Property' and 'Personal Property Not Otherwise
Enumerated,' and though it was designated or asserted to be for
intangible property, nevertheless it was intended to be a part or an
additional valuation of the machinery at the said West Jordan plant.
And the court especially finds that by adding the said amount of
$167,180 to the value of the machinery at said plant, valued at
$237,000 or otherwise added to the value of the said plant, the sum
after making such addition is a fair and reasonable value of the
said machinery or of the said plant, and is not in excess of the
actual cash value of the said machinery or of the said plant; and
the court thus, upon all the evidence, finds that the said assessment
of $167,180 was in fact made as a part valuation of the said ma-
chinery or plant."

(15)   The court found that plaintiff paid all of the taxes
assessed upon the valuation of said $692,080 and that it re-
fused to pay the taxes upon said $10,000,000 and upon said
$167,180 assessments, and that plaintiff claimed that the taxes
upon the said two items last mentioned were ''wrongful, un-
lawful, and void''; that unless defendants were enjoined from
collecting the taxes on said two items last mentioned they

would have sold plaintiff's property, or sufficient thereof to pay the same.

(16)    The court further found that the averment of the defendants that the plaintiff owned $10,000,000 of personal property in Salt Lake county is not supported by the evidence, and that plaintiff did not own any personal property in said county at the times stated herein in excess of $420,505.

(17)    The court further found that—

The business "conducted at the said West Jordan plant in Salt Lake county, and the operations there carried on, were separate and distinct and apart from the operations of any and all other factories or plants, and while there was a unity of ownership of the plaintiff of all of the plants or factories, still there was no unity of plant, or of system, or of business, or of operation, nor was there any unity of use, for each plant or factory was conducted and operated separately and apart from all other plants or factories."

Finding 18 is omitted as not material for the reasons hereinafter appearing in this opinion.

(19)    The court further found that—

It was not claimed or pretended by the defendants, or any of them, that the disputed assessments "were for any kind of franchise or privilege, * * * and that neither of said disputed assessments was founded or based upon any kind of a franchise or privilege in Salt Lake county other than its franchise to be a corporation."

As conclusions of law the court found:

1.    That the assessments for $167,180 was on property at the West Jordan plant, and that said "assessment and taxes thereon are lawful and valid," and that plaintiff should be required to pay said taxes.

2.    That the assessment for $10,000,000 and the taxes sought to be collected thereon are unlawful and void.

Conclusion No. 3 is the same in legal effect as No. 2.

4.    That the defendants pursued a wrongful and unlawful and unauthorized method in making said $10,000,000 assessment, and that they exceeded their jurisdiction and authority in making the same.

Conclusion No. 5 is the same in legal effect as No. 4, and No. 6 is in effect the same as No. 1.

7.    That if the defendants had not been enjoined they would have sold plaintiff's property to collect the taxes as-

sessed upon said $10,000,000, and that plaintiff did not have a plain, speedy, and adequate remedy at law in the premises, and was entitled to have the temporary injunction theretofore granted made permanent.

A judgment or decree was entered in accordance with the findings of facts and conclusions of law by which the defendants were permanently enjoined from collecting the taxes upon said $10,000,000 assessment, and by which the assessment and taxes on said $167,180 were declared legal, and the plaintiff was ordered to pay said taxes.

Although it was necessary to devote much space to the statement of the foregoing findings of fact, yet, in view of the importance of the questions involved and the necessary effect and scope of the conclusions hereinafter reached, we deemed it best to state the findings somewhat in detail; and in order to be fair to both sides and to reflect, so far as possible, the true spirit of the findings we have given many of them in the language of the court.

The defendants have assigned a large number of errors. In those they assail findings numbered 3, 4, 6, 7, 8, 11, 12, 13, 16, 17, 18, and 19. They also assail conclusions of law numbered 2, 3, 4, 5, 6, and 7.

We shall first consider the defendants' appeal, and shall refer to the findings that are assailed by plaintiff when we consider its cross-appeal.

We remark that, although the defendants have assailed numerous findings of fact, yet neither in their briefs nor in their oral arguments have they pointed out any specific finding that is not supported by the evidence, nor have they given any specific ground or reason wherein or why the evidence is insufficient to support any particular finding. Counsel for defendants, in their printed brief, merely state that they have "divided the discussion" into "subdivisions," and, further:

"As the principal questions involved in the discussion run all through the case, we have not undertaken to present the assignments of error separately, but have grouped and discussed them under topical headings or subjects, and have intended to include therein all assignments and to waive none."

While it is not only permissible but often commendable for counsel to group their assignments and consider kindred subjects together, yet when the findings of fact are assailed, which, in the nature of things at least, cannot all, nor even a large portion thereof, be contrary to the evidence, counsel must point out in what particulars the findings are not supported by the evidence; and it is not sufficient merely to make the assignments specific, but if they are relied on they must be specifically referred to in the brief, so that we may know what points are relied on, and where we may look in the record for the evidence or the lack of evidence with respect thereto.

Counsel have argued the following propositions under the following heads or "subdivisions": (1) "Total Value of Assets of Plaintiff as Determined by Assessor." (2) "Value of Plaintiff's Tangible Property as Determined by Assessor." (3) "Value of Plaintiff's Property Outside of Utah." (4) "Value of Plaintiff's Intangible Property." (5) "Method of Ascertaining Value of Intangible Property." (6) "How Intangible Property is Taxable." (7) "Situs of Good Will and Other Intangible Property." (8) "Intangible Property is Subject to Taxation." (9) "Rights and Powers of Assessor and Board of Equalization." (10) "The Taxing Officials Proceeded Under Utmost Good Faith." (11) "Plaintiff was Not Discriminated Against." (12) "The Description of Property." (13) "The Injunction was Improperly Issued."

It goes without saying that we cannot and shall not separately consider each one of the foregoing propositions. Nor is it necessary to do so. We shall consider them, however, so far as they have any material bearing upon the conclusions hereinafter reached. Neither shall we specifically discuss the court's findings, but shall consider them in the course of the opinion, when it becomes necessary to do so.

We shall first consider the $10,000,000 assessment. Defendants' counsel, with much vigor, have argued both in their briefs and orally at the hearing, that the $10,000,000 assessment represents what they term "intangible property" the situs

of which they assert is at the principal office of plaintiff in Salt Lake county, and that the assessment thereof and the tax levied thereon is legal and valid. They base their argument upon the ground that there was not only a unity of ownership of all of plaintiff's factories and property connected therewith, but that there was and is a unity of use. As supporting their contentions, among other cases they cite and rely upon the following: *Adams Express Co.* v. *Ohio,* 165 U. S. 194, 17 Sup. Ct. 305, 41 L. Ed. 683. In that case there is also an exhaustive opinion upon the application for a rehearing which is found in 166 U. S. 185, 17 Sup. Ct. 604, 41 L. Ed. 965; *Henderson Bridge Co.* v. *Kentucky,* 166 U. S. 150, 17 Sup. Ct. 532, 41 L. Ed. 953; *State* v. *Wells Fargo & Co.,* 38 Nev. 505-540, 150 Pac. 836; *State* v. *Duluth Gas & Water Co.,* 76 Minn. 96, 78 N. W. 1032, 57 L. R. A. 63; *City of Los Angeles* v. *Western Union Oil Co.,* 161 Cal. 204, 118 Pac. 720; *Crocker* v. *Scott,* 149 Cal. 575, 87 Pac. 102; *Louisville & Nashville R.. Co.* v. *Greene, Auditor, etc.,* 244 U. S. 522, 37 Sup. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97; *Porter* v. *Rockford I. & St. L. R. Co.,* 76 Ill. 561; *Union Refrigerator Transit Co.* v. *Kentucky,* 199 U. S. 194, 26 Sup. Ct. 36, 50 L. Ed. 150, 4 Ann. Cas. 493; *Hawley* v. *Malden,* 232 U. S. 1, 34 Sup. Ct. 201, 58 L. Ed. 477, Ann. Cas. 1916C, 842; *State* v. *Jones, Auditor,* 51 Ohio St. 492, 37 N. E. 945; *National Bank* v. *City Council,* 136 Iowa, 203, 112 N. W. 829; *Marshalltown, etc. Co.* v. *Welker,* 185 Iowa, 165, 170 N. W. 384; *Com. E. L. & P. Co.* v. *Judson,* 21 Wash. 49, 56 Pac. 829, 57 L. R. A. 78; *Miller & Lux, Inc.* v. *Richardson,* 182 Cal. 115, 187 Pac. 410; *Kern River Co.* v. *County of Los Angeles,* 164 Cal. 751, 130 Pac. 714; *Cream of Wheat Co.* v. *Grand Forks,* 253 U. S. 325, 40 Sup. Ct. 558, 64 L. Ed. 931; *San Francisco* v. *Pennie,* 93 Cal. 465, 29 Pac. 66.

In view that many of the decisions in the foregoing cases are cited, and a few of them quoted from, in the opinion first handed down in this case, and in view that I, at least, did not fully grasp and appreciate the scope and legal effect of those decisions, I shall more fully consider at least some of them than I otherwise would.

Referring to the first case, *Adams Express Co.* v. *Ohio*, supra, in which the question of unity of ownership and unity of use is discussed and distinguished, the court, speaking through Mr. Chief Justice Fuller, in considering the nature of the use of the property owned by the Express Co., 165 U. S. at page 222, 17 Sup. Ct. at page 309 (41 L. Ed. 683) says:

"We repeat that while the unity which exists may not be a physical unity, it is something more than a mere unity of ownership. It is a unity of use, not simply for the convenience or pecuniary profit of the owner, but existing in the very necessities of the case—resulting from the very nature of the business.

"The same party may own a manufacturing establishment in one state and a store in another, and may make profit by operating the two, but the work of each is separate. The value of the factory in itself is not conditioned on that of the store or vice versa, nor is the value of the goods manufactured and sold affected thereby. The connection between the two is merely accidental and growing out of the unity of ownership. But the property of an express company distributed through different states is as an essential condition of the business united in a single specific use. It constitutes but a single plant, made so by the very character and necessities of the business."

The doctrine is again considered in the opinion on rehearing (166 U. S. 185, 17 Sup. Ct. 604, 41 L. Ed. 965), and the views of the Chief Justice, as I have stated them above, are reaffirmed.

In the case of *Henderson Bridge Co.* v. *Kentucky*, supra, the court held that the franchise there in question was taxable as "intangible" property under the Kentucky statute. In the course of the opinion it is said:

"The company was chartered by the state of Kentucky to build and operate a bridge, and the state could properly *include the franchises* it had granted in the valuation of the company's property for taxation." (Italics mine.)

The Legislature of Kentucky, by an express statute, provided for the assessment of "intangible" property as such, something as I shall hereinafter show, the Legislature of this state has entirely omitted to do. Indeed, in this state the franchise to be a corporation—and it is not disputed that that is the only franchise that the plaintiff was granted by the state of Utah—it has been held by this court is not taxable

property. *Black Rock Copper M. & M. Co.* v. *Tingey,* 34 Utah, 369, 98 Pac. 180, 28 L. R. A. (N. S.) 255, 131 Am. St. Rep. 850, and *International Smelting Co.* v. *Tooele County,* 54 Utah, 591, 182 Pac. 841.

The case of *State* v. *Wells Fargo & Co.,* supra, merely follows the doctrine laid down by the United States Supreme Court in the *Adams Express Co.* Case, supra.

In the case of *State* v. *Duluth Gas & Water Co.,* supra, the question of ascertaining the value and assessing the capital stock of a corporation under the Minnesota statute was before the court. It was there held that under the statute franchises and intangible property should be considered in determining the value of the capital stock for assessment purposes. It is, however, not held in that case, nor in any case, in the absence of a statute, that intangible property as such may be separately and independently valued and assessed for taxation. Moreover, in this state capital stock is not taxable as such, but the property it represents is taxable, and, as I hope to show later, the value of the capital stock may be considered in fixing the value of the property which is represented by the stock.

The case of *City of Los Angeles* v. *Western Union Oil Co.,* supra, is a typical California case. Under the California statute franchises to be a corporation are taxable as property. It was therefore held, quoting from the headnote, which is a correct statement of the gist of the decision, that—

"A proper method for ascertaining the value of the franchise of a corporation to be a corporation is to deduct from the aggregate market value of its shares the value of its tangible property, taking the difference as the value of the franchise."

I have already shown that such a franchise is not subject to taxation under our statute, but can only be reached by a license tax as is pointed out in the *Black Rock* Case, supra.

In the case of *Crocker* v. *Scott,* supra, the question before the court was the legality of the assessment of certain National Bank stock and how the value of such stock should be ascertained. While in that case the subjects of "good will"

and "intangible property" are discussed, yet the decision, in view of our statute and the decisions to which I shall hereinafter refer, has no application to the facts and conditions of the case at bar.

What is true of the *Crocker* Case and the *Los Angeles* Case, supra, is true of every other California Case cited, and therefore I shall not review the California cases further.

In the case of *Louisville & Nashville Ry. Co.* v. *Greene, Auditor,* supra, the question decided was whether the method pursued in ascertaining and fixing the value of the franchise of the appellant in that case was legal. Again much is said regarding what may be considered in determining the value of a taxable franchise. The decision has no controlling influence here.

In the case of *Porter* v. *Rockford I. & St. L. R. Co.,* supra, the question again was how the value of a taxable franchise should be ascertained.

The case of *Union Transit Co.* v. *Kentucky,* supra, in principle supports the contentions of the plaintiff rather than those of the defendants. In that case, in speaking of what constituted intangibles, it was said that they consist of "stocks, bonds, notes, and other choses in action." I speak of that merely because defendants' counsel seemingly have confused intangible property of that nature which has a physical existence with the $10,000,000 assessment here in question and which they designate as intangible property subject to separate and independent valuation and taxation.

In *Hawley* v. *Malden,* supra, it is held that shares of stock in a corporation may be assessed against the owner at his domicile, although the shares are issued by a nonresident corporation.

*State* v. *Jones, Auditor,* supra, sustains plaintiff's position. I shall again refer to the decision in that case later.

In *National Bank* v. *City Council,* supra, the Supreme Court of Iowa held that National Bank stock is "in and of itself" tangible property, and when assessed to the owner thereof its value is to be determined by having recourse to all matters that may "have the effect of enhancing or control-

ling its value.'' That no doubt is good law, but has no application here.

The decision in *Marshalltown, etc., Co.* v. *Welker,* supra, has no application to the case at bar.

In *Com. E. L. & P. Co.,* supra, it is held that a franchise which authorizes the use of the streets for certain purposes is taxable. So do we hold.

In *Miller & Lux, Inc.,* v. *Richardson,* supra, the court says that the action "is an action to recover taxes paid under protest by the plaintiff corporation upon alleged illegal and arbitrary assessments of its 'franchise,' " etc. The Supreme Court quotes the California statutes as follows:

"All franchises, other than those of the companies mentioned in sections 2, 3 and 4 of this act [of which plaintiff is not one] shall be assessed at their actual cash value, after making due deduction for good will. * * *"

The Attorney General of California contended that the exception offended against the California Constitution, and the court so held; hence the tax on the good will was sustained. In other words, good will was considered in fixing the value of the franchise.

It is not necessary to review other cases cited, as they contain nothing not already considered.

The foregoing decisions, therefore, do not hold that the property of an individual or of a private corporation like plaintiff which is situate and used in one state may be assessed or taxed in a state other than where such property is situated and used. The question respecting the so-called unity of use as applied to corporations other than interstate railways was perhaps first considered in the case of *Adams Express Co.* v. *Ohio,* and followed in the case of *Henderson Bridge Co.* v. *Kentucky,* supra. It will be observed that in both of those cases the decision is by a divided court, five to four. The doctrine of the unity of use for the purposes of taxation, while now well settled by the decisions of the Supreme Court of the United States, has, nevertheless, never been carried or extended beyond the express company cases. As to interstate railways whose rolling stock is constantly

moving and shifting from one state to another, it became necessary in order to establish a just and equitable system of taxation to assess such property in all of the states in which it was used by making a proper apportionment among or between such states, and therefore the doctrine of unity of use was not only thoroughly practicable, but was just and equitable. The doctrine never has been applied, however, nor can it justly and equitably be applied, to manufacturing or other similar plants or industries which may be under common ownership but used or operated in different states. Taking plaintiff's numerous plants as an illustration, in the very nature of things they are, precisely as the court found, operated and used entirely independent of one another. The failure or even the destruction of one factory or plant has no effect upon any other one. Neither is the property used in connection with those plants, or any part of it, used at any time in one state and at another time shifted or moved to another state. But the plants and the property used in connection therewith are just as stationary and immovable as though each one was owned by a different individual or corporation. All there is, therefore, is a unity of ownership, which as a matter of course, cannot control either local or general taxation. In none of the cases above cited is there anything to the contrary. Indeed, the decisions clearly support the conclusions I have just stated. True, some of the cases hold that where franchises to be a corporation are taxable, then the value of such franchises may be ascertained by ascertaining the total value of the capital stock, and then deducting therefrom the total value of the tangible corporate property, and if there is a difference between the two, such difference should be taken as the value of the franchise; and that method may be pursued with other franchises, if there are any. It is, however, expressly found by the district court in the case at bar, which fact cannot well be disputed, that the plaintiff had no taxable franchise of any kind, and hence there was nothing upon which the foregoing method of fixing the $10,000,000 assessment could be applied. It is very clear to the writer that the cases cited

by defendants in no way justify the $10,000,000 assessment in the form of intagible property.

It is, however, also contended that under our constitutional provisions respecting taxation the $10,000,000 assessment should stand. Section 2 of article 13 of our Constitution, so far as material here, provides:

"All property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed in proportion to its value, to be ascertained as provided by law. The word property, as used in this article, is hereby declared to include moneys, credits, bonds, stocks, franchises and all matters and things (real, personal or mixed) capable of private ownership; but this shall not be so construed as to authorize the taxation of the stocks of any company or corporation, when the property of such company or corporation represented by such stocks, has been taxed."

The following section in part provides:

"The Legislature shall provide by law a uniform and equal rate of assessment and taxation on all property in the state, according to its value in money, and shall prescribe by general law such regulations as shall secure a just valuation for taxation of all property, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property: Provided, that a deduction of debits from credits may be authorized."

It is not necessary now to refer to the provisions of our statutes since those necessarily follow the Constitution.

The word "franchises," as used in section 2 above, as already pointed out, was construed and applied in the *Black Rock* Case, supra. It was there held that in view of other constitutional provisions that term had no application to franchises to be a corporation, and thus cannot be taxed as other property is taxed.

It is contended, however, that good will, the earning capacity, the productiveness of the property and the actual earnings, together with all matters that may enhance or influence the value of tangible property, may be considered, and that the things just enumerated constitute intangible property, all of which is taxable under the constitutional provisions to which reference has just been made. It is cheerfully conceded—indeed no one disputes the contention—that all of the things last above enumerated which may influence or enhance

the actual value of tangible property, not only may, but should, be considered by the assessing authorities in arriving at the actual value of property for taxation. The question, however, is, may those elements, in the absence of express statutory authority, be taxed or assessed under the designation of "intangible property," or "other personal property," as was done in the case at bar? Under the authorities, as I read them, but one answer is permissible, which is in the negative.

In *Re Stevens*, 46 Misc. Rep. 649, 95 N. Y. Supp. 313, good will is defined in these terms:

"* * * And 'good will' is the reputation of an established business. Both [the corporate franchise and good will] are intangible assets of the corporation. Neither is a part of its working capital. Both are represented by the share stock held by its stockholders. Both are dependent upon the corporate existence, and 'good will' can only exist in connection with an existing and going business. Both are appurtenant to the corporation as such, and have no independent existence apart from it. Both constitute elements of value in connection with, but not apart from, the corporation and its business."

In *Lindermann* v. *Rusk*, 125 Wis. 210, at page 233, 104 N. W. 119, at page 126, the Supreme Court of Wisconsin says:

"Good will is the result of the employment of capital in some established business. It augments its value and is an incident to the conduct of the enterprise. It exists at the place where the business is carried on, and gives value to the enterprise because of the benefits that are likely to come to a successor and. which arise from being connected with its reputation."

In *Mitchell* v. *Read*, 19 Hun (N. Y.) at page 422, the court says:

"Good will, however it may be defined generally, does not exist separate and independent of a substantive or principal subject. It always appertains to something else, and is as various as the subjects are to which it appertains."

In 12 R. C. L. § 5, p. 981, the doctrine is admirably stated thus:

"It has frequently been held that good will is not a property right subject to taxation, yet, apparently as a consequence of the franchise tax, the tax on the corporate receipts, and the idea of taxing corporate property as a unit, all of which are largely of

modern growth, it is now coming more to be recognized that in determining the value of corporate stock for purposes of taxation, according to statute, the value of the good will of the corporation must be considered in connection with the other assets in determining the value of the stock."

Numerous similar statements from the decisions might be quoted, but the foregoing are quite sufficient to illustrate the principle now under consideration.

With respect to the right of the assessor to take into consideration the value of tangible property situate in one state to enhance the value of property within another state, the United States Supreme Court, in *Delaware, L. & W. R. Co.* v. *Pennsylvania,* 198 U. S., at page 356, 25 Sup. Ct. at page 674 (49 L. Ed. 1077), says:

"So, if the state cannot tax tangible property permanently outside of the state and having no situs within the state, it cannot attain the same end by taxing the enhanced value of the capital stock of the corporation which arises from the value of the property beyond the jurisdiction of the state."

If we substitute the word "property" in the foregoing quotation for the words "capital stock," it is quite clear that the $10,000,000 assessment is illegal and cannot stand. While it is quite true that in taxing the property of a foreign corporation which is in the taxing state the latter state may "look beyond its borders * * * that it may get the true value of the things within" the state, yet the "only reason" why that may be done is to obtain the true value of the property in the taxing state. *Wallace* v. *Hines,* 253 U. S. 69, 40 Sup. Ct. 435, 64 L. Ed. 782.

As a matter of course, where the legal situs of personal property such as notes, bonds, etc., is at the domicile of the owner, such property may be taxed to such owner in the state where he has his domicile. We are, however, not dealing with such property and with no such condition. We are here confronted with a condition outlined in the recent decision in *Davis* v. *Wallace,* 257 U. S. 478, at page 485, 42 Sup. Ct. 164, at page 166 (66 L. Ed. —), where, in concluding the opinion, it is said:

"From what has been said it follows that to sustain the tax in

question we should have to hold that the taxing officers, on finding that it could not constitutionally be assessed on the basis specially prescribed in the statute, were at liberty to assess it on another and different basis, which the statute shows was not to be applied to corporations of the class to which these railroad companies belong. Of course we cannot so hold."

Again, in *New Orleans* v. *Stempel,* 175 U. S. 309, at page 312, 20 Sup. Ct. 110, at page 111 (44 L. Ed. 174) in speaking of the authority to tax property, the court says:

"Of course, there must be statutory warrant for such taxation, for if the Legislature omits any property from the list of taxables, the courts are not authorized to correct the omission and adjudge the omitted property to be subject to taxation."

By the foregoing quotation is not meant, neither do we hold, that intangible property may not be taxed; but what we hold is that, unless there is statutory authority to do otherwise, intangible property of the kind and character here in question—that is, that included within the $10,000,000 assessment—must be considered merely as it may enhance or influence the value of the tangible property, and hence must be treated and taxed as tangible property and not separately or independently. The doctrine is clearly illustrated by the Supreme Court of Indiana in *Hart* v. *Smith,* 159 Ind. 182, 64 N. E. 661, 58 L. R. A. 949, 95 Am. St. Rep. 280. The provisions of the Indiana Constitution respecting the taxation of property are substantially like those hereinbefore quoted. In the case just referred to, however, the question before the court was the assessment or taxation of the good will of a newspaper plant separate and apart from the tangible property. In that case, as here, the good will was placed at a value in excess of the value of the tangible property. The court enjoined the collection of the tax for the reason that without statutory warrant intangible property could not be separately assessed, but could be considered only in connection with and as enhancing or influencing the value of the tangible property. That case, it seems to me, standing alone, would be conclusive that the $10,000,000 assessment cannot prevail.

In the case of *Street R. Co.* v. *Marrow,* 87 Tenn. 406, 11

S. W. 348, in which state corporate franchises are considered as intangible property, it is said:

"Franchises of corporations are taxable property, and should be assessed, not separately, but with its tangible property."

As bearing upon the question, see, also, *State* v. *Austin & N. W. R. Co.*, 94 Tex. 530, 62 S. W. 1050; *Southwestern T. & T. Co.* v. *Meerscheidt Tax Collector* (Tex. Civ. App.) 65 S. W. 381. I refrain from citing other cases in which the decisions are to the same effect. In some states, however, notably in Kentucky, the statute provides for the taxation of intangible property separately. Such is also the case in some other states. See *Western Union, etc., Co.* v. *City of Omaha*, 73 Neb. 527, 103 N. W. 84; *State* v. *Franklin County, etc.*, 74 Vt. 246, 52 Atl. 1069, and *Rocheblave Market Co.* v. *City of New Orleans*, 110 La. 529, 34 South. 665.

The conclusion is therefore irresistible, in so far as the $10,000,000 assessment was based upon plaintiff's factories and the property used in connection therewith situate in states other than Utah, that that assessment must fail for the reason that the assessor and the county board of equalization clearly and manifestly exceeded their jurisdiction or authority in making it.

Having thus shown that neither the tangible nor the intangible property owned and used by plaintiff in states other than the state of Utah is taxable in Salt Lake county, where the principal office of plaintiff is situate, we now proceed to consider whether the so-called intangible property in question here, and which is situated in the several counties of this state, may be assessed and taxed at the home office of the plaintiff.

Section 10 of article 13 of our Constitution provides:

"All corporations or persons in this state, or doing business herein, shall be subject to taxation for state, county, school, municipal or other purposes, on the real and personal property owned or used by them within the territorial limits of the authority levying the tax."

Our statute follows the Constitution, and therefore no special reference need be made thereto.

It will thus be seen that the Constitution provides that the

property owned and used by all persons, including corporations, is subject to taxation "within the territorial limits of the authority levying the tax." That section was before this court, and was construed and applied in the case of *Murdock* v. *Murdock,* 38 Utah, 373, 113 Pac. 330. It was there held that, regardless of the residence or domicile of the owner, all property must be taxed in the taxing districts where it is situated and used. If, therefore, defendants are right that under our Constitution all intangible property is taxable the same as is tangible property, it nevertheless must follow that it is taxable only at the place where it is used in connection with the tangible property; and that would be so even though it were held that the so-called intangible prop-    **7, 8** erty in question here could be assessed separately and independently and apart from the tangible property out of which it arises. If it were held, however, that the situs of the so-called intangible property here in question, so far as the same arises out of plaintiff's property, which it owned and used in states other than Utah, were at its home office in Salt Lake county (which we have held it is not), yet, in view that that portion of the $10,000,000 assessment which arises out of plaintiff's property owned and used in counties other than Salt Lake may be legally assessed in such counties only, the $10,000,000 assessment would fail for the reason that that assessment is made in a lump sum, and could not be apportioned; that is, there would be no method by which the value of the so-called intangible property arising out of plaintiff's tangible property in other states could be segregated from that which is in the several counties in this state.

But there is still another insuperable obstacle in the way of the $10,000,000 assessment which cannot be overcome so long as the constitutional provision fixing the place where property is taxable remains in force. As pointed out, the Constitution provides that all property is taxable "within the territorial limits of the authority levying the tax"; that is, where the property is situated and used. From this it follows as a necessary corollary that all property, whether tangible or intangible, if subject to taxation, must be

taxed by the authorities who have the power to levy
the tax.   If, therefore, a corporation owns factories,
and property used in connection therewith, which are situated
in different counties, no one would contend that the tangible
property could be assessed in a lump sum and apportioned
among the several counties.   What is true of the tangible is
likewise true of the intangible property.   The Constitution
in plain terms provides that the authorities of each county
must assess the property for taxation.   The authority to do
that is therefore conferred upon them and upon no one else.
It is their judgment respecting the value of the property
within their county, and not that of the authorities of Salt
Lake county, or of any other county, that the taxpayer is
entitled to and which must control in determining the value
of the property to be taxed.   That, in view of constitutional
provisions, is so palpably clear that argument seems entirely
superfluous.

It is, however, also true that while the authorities consider
the elements herein denominated intangible, such elements
must be applied to all property alike.   That is also made
quite as imperative by our Constitution as is the duty that
property must be taxed at its full value.   If, therefore, the
method which was adopted by the assessor in this case is fol-
lowed, then it also follows that in view that the property of
corporations only is represented by capital stock it is prin-
cipally if not exclusively corporate property that will be
assessed in the form of intangible property, since, as is demon-
strated in this case, the supposed intangible property is
easily ascertainable by merely deducting the estimated value
of the tangible property from the total value of the capital
stock, and then calling the difference, if any, intangible prop-
erty and assess it as such.   If, however, the property is not
represented by capital stock, that method cannot be pursued,
and, in view that it cannot be, corporate property only will
be assessed in that way, and the so-called intangible prop-
erty of the individual or of copartnerships will escape taxa-
tion because it cannot be reached by the method adopted by
the assessor in this case.   From this it necessarily fol-

lows that if the provisions of our Constitution are to be followed in assessing property, then all the elements that enter into and tend to enhance or affect the value of property must be considered in estimating its value for taxation, and the property owned by an individual or by a copartnership must be treated the same as that owned by a corporation. In view, therefore, that the so-called intangible property in this case consists merely of the elements aforesaid, and which enhance the value of the tangible property, the so-called intangible property should have been considered and taxed as a part of the tangible property and not as intangible.

If the method adopted by the assessor in this case is followed, it inevitably must result in taxing a large portion of the corporate stock indirectly which the Constitution provides may not be done directly. The only proper method, therefore, of taxing so-called intangible property all alike is by considering all the elements that in any way affect or enhance the value of property in determining its value for taxation.

But there is still a further reason why the taxes derived from the intangible property may not be apportioned as suggested in the former opinion. Since all property is taxable where situated, each county is entitled to assess all property within its territorial limits at its actual value. The intangible property, which principally arises out of the productiveness of the tangible property, therefore depends upon the earning capacity and the actual earnings of the property in each county, including good will, and not upon the combined productiveness of all the property owned by a common owner in all of the counties. The factories, or some of them, situate in Utah county may produce much greater profits to the owner than the factory in Salt Lake county, and vice versa. Indeed, the factory in Salt Lake county may operate at a loss. From this it necessarily follows that the actual value of the intangible property can only be ascertained by considering each factory or each plant separately, and not considering all of them as a unit. If the latter course is pursued, one county may suffer an appreciable loss, while another may

obtain that to which it is not legally entitled. It is manifest, therefore, that in this state intangible property of the character in question here can only be considered and taxed ir connection with and as a part of the tangible property.

Then again, the $10,000,000 assessment must fail becaus; all that the assessor of Salt Lake county did was to determine to his own satisfaction that the assessors in this as well as in other states did not assess plaintiff's property at its full cash value; hence he would do what in his judgment the other assessors omitted to do, namely, assess what they had failed to assess. While no doubt any assessor is to be commended and upheld in assessing taxable property at its true value, yet in doing that he may not exceed his authority and assess property which is entirely beyond his jurisdiction. To attempt that is usurpation pure and simple, which, in the long run, would be quite as pernicious as to undervalue some property. The latter evil may be cured by the boards of equalization, while the former, if once sanctioned by the courts, would be intolerable.

We have not discussed the findings of fact or conclusions of law specially because such was not necessary. Nor have we discussed the description of the property with respect to the $10,000,000 assessment. We could subserve no good purpose in doing so, for the reason that that question, so far as that assessment is concerned, is not relevant to this controversy. As we have seen, that assessment must necessarily be held invalid regardless of any description that the assessor or the board of equalization might have given it. When once it is conceded that that assessment represented no part of the property described in plaintiff's financial statement, and that it had no physical existence, but was in fact intangible because it arose out of the earning capacity, the actual earnings including good will, etc., of plaintiff's tangible property wherever situated, it could not legally be assessed under any possible description. It is not necessary, therefore, to decide that question now.

Neither is it necessary to discuss plaintiff's financial statement. While it is very clear that when the tangible property

described in that statement is deducted from the total value of plaintiff's property, which is given as over $26,000,000, only a part of the $10,000,000 assessment will remain, yet in view of the conclusions reached that question likewise becomes wholly immaterial.

Neither is it necessary to consider the powers of the assessor and the board of equalization, which is argued by defendants, nor the legal presumptions pertaining to the performance of duties by those officers. In view that both the assessor and the board of equalization exceeded their authority, those questions are of no moment here.

Much is also said in defendants' brief about dividends that were paid by plaintiff to its stockholders; that it was not pay-ing its just proportion of taxes in that much of its property escaped taxation, etc. No doubt it is the duty of the assessor to assess all taxable property at its value, and it is like-wise the duty of every person and corporation having **12** taxable property to list the same for taxation. Those matters, however, cannot make an assessment which is un-authorized legal. In view of the facts as found, and as they undisputably exist, that question, while important under cer-tain conditions, has absolutely no relevancy here, and hence will not be considered. We remark, however, that in this case the undisputed facts show, and the court so found, that the assessor of Salt Lake county did his full duty, in that he assessed all of plaintiff's property situated within Salt Lake county at its full value. Moreover, it is also clear that the plaintiff furnished the assessor a full and complete state-ment of its assets, and also informed him where its property was situated. Indeed, the assessor testified that he was given full information. It therefore necessarily follows that the defendants' appeal cannot be sustained, and that as to that the judgment should be affirmed.

This brings us to plaintiff's appeal, which involves the as-sessment of the $167,180. Plaintiff's counsel assail findings numbered 14 and 15 wherein the court found that the prop-erty valued at said sum of $167,180 ''was on the assessment roll placed in the columns as 'Other Taxable Property' and

'Personal Property Not Otherwise Enumerated,' and though it was designated or asserted to be for intangible property, nevertheless it was intended to be a part or an additional valuation of machinery at said West Jordan plant," and wherein the court further found that the amount added to the value of said machinery, to wit, said $167,180, "is a fair and reasonable value of said machinery or of said plant, and is not in excess of the actual cash value of the said machinery or of said plant; and the court thus, upon all the evidence, finds that the said assessment of $167,180 was, in fact made as a part valuation of said machinery or said plant." These findings, as the writer reads the evidence, are supported thereby. The principal difficulty with the assessment is not so much the lack of evidence to support it as it is the irregular and peculiar manner in which it was made by the assessor and the method pursued by him and the board of equalization in assessing the machinery, etc., at the additional value before stated. While at least some of the irregularities were inexcusable and are here directly assailed, yet the writer, with some hesitation and after much reflection, has nevertheless arrived at the conclusion that the tax upon the assessment of the $167,180 should not be held **13** illegal and invalid. Both plaintiff and its counsel knew of the irregularities, and presented the whole matter to the board of equalization, and asked that that assessment be canceled. Let it be assumed that the board erred in holding as it did, yet that, standing alone, would not make the tax illegal and subject to an injunction. Comp. Laws Utah 1917, § 6087, provides:

"No assessment or act relating to assessment or collection of taxes is illegal on account of informality or because the same was not completed within the time required by law."

In section 6093 it is provided that no injunction shall be granted to restrain the collection of any tax or any part thereof "except where the tax, or some part thereof * * * is illegal, or is not authorized by law, or the property is exempt from taxation." As I construe the statutes of this state, and as in my judgment they should be applied to the

facts found by the court, namely, that the assessment represents a fair and just valuation of the machinery embraced in said valuation, I am persuaded that the assessment of said $167,180 should not be held illegal, nor should it be held as not authorized by law. If my conclusions are sound in that respect, it necessarily follows that the judgment of the district court sustaining the assessment of said $167,180 is not vulnerable to the attack that is made upon it, and hence should be affirmed.

While the immediate effect of the result now reached differs but little from the immediate effect of the result reached in the former opinion, yet the difference in the effect upon the assessment and taxation of property generally between the result now reached as compared with that reached in the former opinion is irreconcilable and radical. After much consideration and reflection the writer became convinced that if the method herein outlined in determining the actual value of property is followed, all taxable property, wherever, and however owned, may be taxed at its full value and at the place where by the Constitution it is made taxable, while, if the method that was adopted by the assessor in this case, and which was approved in the former opinion, is followed, not only much injustice may result, but the provisions of the Constitution respecting taxation of property may be evaded, if not entirely annulled. It was therefore deemed of much greater importance that a correct result be reached than that a particular assessment be sustained.

From what has been said it follows that the judgment of the district court should be, and it accordingly is, affirmed on both appeals. It is ordered that each party pay its own costs in this court.

CORFMAN, C. J., concurs.

THURMAN, J. I concur in the opinion of Mr. Justice FRICK. I am satisfied with his analysis of the cases relied on by both appellants and respondent, and see no escape from the conclusion reached by him that the $10,000,000 assess-

ment was without authority of law, and is therefore null and void.  I agree with him also on the proposition that the only possible method under existing laws by which intangible property can be assessed is to assess the physical property at its value as the same is enhanced by the intangible value arising therefrom.  The difficulty, however, in making such an assessment, even if valid under the law as it exists to-day, is practically insuperable.  The cases are so numerous in which our present law would prove totally inadequate that it renders the law itself palpably discriminatory and violative of the uniformity clause of the Constitution.  In a brief dissenting opinion filed by me when the former opinion was rendered I made the following observations, which are as pertinent now as they were at that time:

"The Constitution requires uniformity in taxation and abhors discrimination, whether the taxpayer be an individual or a corporation.  If A. and B., private persons, own property of the same kind and value in the same taxing district, and are engaged in the same kind of business we naturally expect the amount of their property tax will be the same, notwithstanding B.'s income or profits from its business may double or treble that of A.  We not only expect their taxes will be the same, but, as matter of common knowledge, we know that such is the usual and ordinary result.  If, however, B. should dispose of his property and business to C. and C. should form a corporation which handles his property and conducts the business with the same skill and prudence as did B., whereby it earns the same income and no more, there is no reason why the property and business should be subjected to a greater tax than it would have been if B had continued to be the owner.  Assuming that the par value of the shares of the corporation represents the actual value of the tangible property, and. each share, through prudent management, has, increased in value 25 per cent., the scheme is to assess the corporation for this additional value under the head of intangible property.  In my opinion, it is neither more nor less in effect than a tax based upon income, and as a property tax is by implication excluded by the provision of the state Constitution (article 13, § 12) which reads as follows:  'Nothing in this Constitution shall be construed to prevent the Legislature from providing a stamp tax, or a tax based on income, occupation, licenses or franchise.'

"From the section just quoted nothing can be clearer than that the constitutional convention regarded a property tax as one thing and a tax based upon income as another.  The tax on property was

provided for in the preceding sections of the article, while a tax based upon income was provided for as a separate and distinct subject of taxation in the section quoted. With this provision of the Constitution staring him in the face, what right or power had the assessor of Salt Lake county to assume that the income or earnings from the management of physical property not reduced to tangible form could be assessed as property the same as physical property may be assessed? It is not only vicious in its manifest discrimination, as the same is administered by the assessor, but as a tax based on income it is without the sanction of legislative authority. The Legislature has never yet, directly or indirectly, determined that an income tax in any form should be adopted as the policy of the state. The writer has no antipathy towards such a tax when adopted by legislative authority, with suitable agencies to make the assessment uniform and effectual. Uniformity in the matter of taxation is just as mandatory under the Constitution as is the requirement that all property be taxed according to its value. I am aware of the fact that the assessor in the instant case made a pretense of assessing the intangible property of a few other corporations and individuals in the country, as well as that of the plaintiff company, but such assessments were so manifestly few and insignificant by comparison as to render more apparent a deliberate and intentional discrimination."

It is suggested by my associate Mr. Justice GIDEON in a separate opinion filed herewith that the management of a business is one of the factors of its intangible value. The proposition is uncontrovertible as shown in the illustration heretofore made concerning the operations of A, B, and C. But, as there suggested, under the method adopted by the assessor in the instant case, the intangible value resulting from the good management of B. was not assessable so long as he continued to be the owner of the property. It became assessable only when transferred to a corporation, and that too in a state where confessedly a franchise to be a corporation is not assessable under the laws relating to taxation.

The method adopted by the assessor, as far as the $10,000,-000 assessment is concerned, is illegal, incongruous discriminatory, and unjust, and in my opinion contravenes both the Constitution and laws of the state.

I concur in the opinion affirming the judgment of the court below.

GIDEON, J. (dissenting in part).   In my judgment nothing has been presented in the arguments upon rehearing that should change the result reached in the former opinion.   No new argument is advanced nor reason suggested that was not embraced in the elaborate printed and oral arguments presented at the time of the first submission of the cause.   The writer prepared the former opinion, and stated at some length the unchallenged facts presented by the record, and set forth the reasons for the conclusions arrived at.   I am now filing that opinion as my views upon the chief question involved.   Some slight changes in phraseology have been made in order that the thought sought to be conveyed may be more clearly expressed.   Such portions as are not applicable to dissenting views are omitted, and some additional remarks are added.

This is an equitable proceeding, and we are required to pass upon the weight of the evidence and determine whether the record supports the findings of fact, conclusions of law and judgment.

The complaint alleges that respondent, on January 1, 1918, owned certain real and personal property situate in Salt Lake county, which is described in detail; that all of said property was regularly assessed and the taxes thereon paid for that year; that the property described in the complaint constituted all of the property owned by respondent in said county subject to taxation in the year 1918; that in addition to the property so located in said county two other assessments, one of $167,180 and the other of $10,000,000, were made, and notices thereof mailed to and received by the respondent; that the last-named assessments were purported to be on personal property claimed to have been owned by respondent in said county; that pursuant to the notices the respondent protested in writing before the board of equalization in said county against such assessments for and on account of insufficiency of description; that respondent possessed no such property covered or sought to be covered by either assessment, and that the property attempted to be reached was not subject to taxation under the laws of the state of Utah.   The

complaint 'also charges that the board of equalization heard and considered the protest of respondent and overruled the same, and ordered that the assessments made by the county assessor should be upheld. It is then charged that in so doing the said board of equalization acted arbitrarily and capriciously, and that said assessments are discriminatory and in violation of the rights of respondent as guaranteed to it under the state and federal Constitutions.

Appellants admitted the allegations respecting the organization of respondent. Denied that the assessment of $167,-180 was on intangible property. Admitted that both items of assessment had been equalized as the law provides. Denied that respondent had no such property, and denied that such assessments, or either of them, were discriminatory or in violation of any of the constitutional rights of respondent. Denied that the said property was not properly or sufficiently described. Denied that said assessments were made arbitrarily or capriciously. As a further defense it is alleged in the answer that the assessments were, and each of them was, regularly made and equalized in all respects as provided by law, and made upon and against property of respondent subject to taxation in Salt Lake county.

Respondent is a Utah corporation, with its principal office and general place of business at Salt Lake City in the county of Salt Lake, state of Utah. It is extensively engaged in the manufacture and sale of beet sugar. It owns 12 factories located in the states of Utah, Idaho, Oregon, and Washington. Only one of the manufacturing plants is located within Salt Lake county. Five are located in other counties in the state of Utah; four in different counties in the state of Idaho; one in the state of Washington, and one in the state of Oregon. It is conceded that the factories and real estate, in fact all tangible property located in the several counties where the factories are situated, was assessed by the officials of such counties, and taxes paid on the assessments so made in the year 1918. The physical property located in Salt Lake county was regularly assessed as such, and the taxes, except the item of $167,180, paid on that property by respondent,

It appears that the respondent company was organized about the year 1890, with an authorized capital of $500,000; that in 1907 it had an authorized capitalization of 1,000,000 shares of the par value of $10 each. In 1907 it owned and operated 9 factories. In 1917 it had 12 factories. At the beginning of 1917 there was outstanding stock of approximately 950,000 shares. In February of 1917 the directors of respondent caused a reappraisement of all of the company's property to be made by a committee appointed for that purpose. That committee's report placed the value of the entire assets of the company at about $26,000,000. That appraisement, as testified to by the vice president of the company, was a reasonable one. Thereupon the authorized capital stock of the company was increased from $10,000,000 to $30,000,000. A stock dividend of 150 per cent. was declared, and stock issued to the several stockholders in payment thereof. Respondent's surplus was reduced to approximately $1,300,000. The additional stock issued, carrying into effect the stock dividend, left outstanding capital stock of 2,366,635 shares of the par value of $26,626,350. It also appears that the average annual dividend paid by the company from 1907 to 1917 was 7 or 7½ per cent. From the testimony of the respondent's vice president, as found in the printed abstract, we quote:

"In 1907 we had 9 factories, and in 1917 12 factories. The original factories were enlarged during that period. They were increased in capacity. To be more particular, what we call the Steffins plant, it is not increased in capacity. The plants were brought up to date with the most approved mechanical appliances. These factories were, between 1907 and 1917, built from the profits, the surplus accumulations of the company. There was no issue of stock or any stock issued for that purpose. The profits of the company were expended in the payment of dividends and expenses, and then the balance carried to surplus and the surplus expended in the expansion of the business."

In 1917 a dividend of 3 per cent. upon the issued stock of $9,500,000 was paid. After the stock dividend had been declared and the stock issued an additional dividend of 6 per cent. was paid upon the increased capital stock. In 1918 a dividend of 9 per cent. was paid upon this increased capital.

In 1918 the market value of the capital stock of respondent varied from $8.55 to $8.90 per share. The vice president of the company testified that in arriving at the value in the reappraisement the committee took into consideration, not only the physical property owned by the company, but the products of the factories, the revenues derived from the operation of the same, and the dividends the company had paid, could pay, and ought to be able to pay, on the increased stock or increased value. In the month of February, 1918, the respondent company had prepared and issued a financial statement, which is found in the record and is known as defendants' Exhibit 1 on cross-examination. That statement shows total assets in excess of $26,000,000.

It appears that the total assessed valuation of all of the tangible property of the respondent in the several counties in the states where the property is located, including the factory and other tangible property in Salt Lake county, was in excess of $9,000,000. The respondent maintains offices in each of the several counties of this and other states where factories are located. The operation of these factories in the manufacture of sugar is directed by officers or employés in charge of the local offices. There the contracts are made with the farmers residing in the particular vicinity for beets to be manufactured into sugar at that particular plant. The relationship, or, rather, connection of these several plants in the operation of the same, is described by the assistant secretary of respondent, as found in the printed abstract, as follows:

"Each factory sends us monthly reports showing the business transacted for the month, but do not remit any funds. They call upon the general office for money to make payment of their labor pay rolls. We remit to cover their requisition by check in the manner as requested by them. We send the money to the banks with which the factory does business. The factories collect moneys from the sale of materials, collections from farmers, etc., anything they sold, anything as owing them, that would come through their office. They would sell pulp, hay, and grain and turn the money into their account towards paying their pay rolls as far as it would go. They would charge the person with it, and in due time collect, and that would be reported as a collection to the general office.

They would retain the money and make requisition on us for the balance. They always require money from us. If they need more money than they collect, they apply to the home office for the deficit. The do not remit to us anything, and do not keep any unusual amount on hand. They do not call on us monthly for money, but possibly every other day or so, as often as it is required. None of the pulp is sold from this office. The molasses is all ordered out from the home office, but the account is kept at the factory, and the remittance for the molasses is made to the office of the factory shipping it."

It also appears that practically all of the corporate affairs of the company are transacted at its general office in Salt Lake City. Accounts with each of the various sugar factories are kept in that office. The sugar manufactured at respondent's various plants is sold from the general office, and all deliveries are ordered from that office. All evidences of debts, accounts, and bills receivable, stocks, bonds, and mortgages are kept and entered upon the books of the company at its home office in Salt Lake City. The officials of the company, from the home office, have general direction and control over the operation and management of each individual factory. Additional facts will be stated in the course of this opinion in considering the law applicable to such facts.

It is insisted by appellants that the court's finding that the respondent had no such property as was attempted to be assessed in Salt Lake county is not only contrary to the weight of the evidence, but is contrary to the facts proven conclusively, and that it is apparent from the whole record that such property as was attempted to be assessed and was assessed was the property of respondent, and had its situs for taxation purposes in Salt Lake county.

The provisions of our state Constitution, so far as material here, are as follows:

"All the property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed in proportion to its value, to be ascertained as provided by law. The word property, as used in this article, is hereby declared to include moneys, credits, bonds, stocks, franchises and all matters and things (real, personal and mixed) capable of private ownership; but this shall not be so construed as to authorize the taxation of the stocks of any company or corporation, when the property of such

company or corporation represented by such stocks has been taxed. * * *" Article 13, § 2.

"The Legislature shall provide by law a uniform and equal rate of assessment and taxation on all property in the state, according to its value in money, and shall prescribe by general law such regulations as shall secure a just valuation for taxation of all property, so that every person and corporation shall pay a tax in proportion to the value of his, her or its property. * * *" Article 13, § 3.

The sections of Comp. Laws Utah 1917, so far as material, are as follows:

Section 5861: "All property in this state, not exempt under the laws of the United States, or under the Constitution of this state, shall be taxed in proportion to its value, as hereinafter provided."

Section 5865: "Whenever the terms mentioned in this section are employed in this title, they are employed in the sense hereinafter affixed to them, to wit:

"1. The term 'property' includes moneys, credits, bonds, stocks, franchises, and all other matters and things, real, personal, and mixed, capable of private ownership; but this shall not be so construed as to authorize the taxation of the stocks of any company or corporation, when the property of such company or corporation, represented by such stocks, has been taxed;

＊　＊　＊　＊　＊　＊　＊　＊　＊　＊

"4. The term 'personal property' includes everything which is the subject of ownership not included within the meaning of the terms 'real estate' and 'improvements';

"5. The terms 'value' and 'full cash value' mean the amount at which the property would be taken in payment of a just debt due from a solvent debtor."

Section 5875: "All taxable property must be assessed in the county, city, town, or district in which it is situated. * * *"

Section 5888: "The property of every firm and corporation must be assessed in the county where the property is situated, and must be assessed in the name of the firm or corporation."

Four propositions are presented and urged against the judgment entered in the district court, namely: (a) That it is conclusively shown that the respondent company owns and has property which is designated "intangible property" equal in value to the amount of the assessment made against it, the collection of a tax on which is sought to be enjoined by this proceeding. (b) That the situs or location of that property for the purposes of taxation is in Salt Lake county, where the principal office of respondent company is located.

(c)    That the description of the property is sufficient to meet the requirements of the statute.    (d)    That the assessment was regularly made.    I shall consider these propositions in the order named.

In the discussion of the questions presented on this appeal certain rules of law under our Constitution and statutes may be considered as being incontrovertible:    (a)    All property of whatever nature in the state, tangible or intangible, not exempt, is subject to taxation.    (b)    The value of any property for the purposes of taxation is the value of such property for sale and income.    (c)    The county taxing officials have no authority to levy a tax against or upon property not situate within the boundaries of such county.    (d)    Every tax levied by a public official is presumed to be valid and to have been regularly assessed and the burden is upon the party attacking the tax to show its invalidity.    (e)    The selling value, earning power and income resulting to the owner from the use or operation of physical property constitutes property subject to taxation and capable of being taxed in addition to the tax against such physical property.

If the Constitution includes in the scheme of taxation all property not exempt, recognition of intangible property compels an assessment of such property within the district where it has a situs for taxation purposes.    It is without dispute that the several factories owned and operated by the respondent company are under the general control and management of the officials of the company who direct its affairs from the general office in Salt Lake City.    The value of the products manufactured at each factory is fixed at the general office; the sale of sugar, the chief product, is made under the direction of and by the officials at the home office; the time of sale and the amount to be taken from any particular factory are there decided upon; a general manager with headquarters at this office is in the active general supervision and control of the various factories.    It is undeniable that by reason of all this control the expenses of operating the factories and disposing of the products are greatly reduced.    The financial credit enjoyed by the respondent by reason of these various

factors; its general and extensive knowledge of the market conditions; its control of the sale of the products of the various factories; its ability thereby to supply a greater amount of sugar than could be supplied by any one factory, are, and must be, of great money value. There is no question of ownership. Neither is there any question of unity of operation in the manufacture and sale of the products of the different factories. That such combined ownership and use gives to the corporation owning and controlling the same a value independent of and separate from the value of the physical property considered as separate units is amply demonstrated by the success of the company for a period of many years prior to the date of the assessments in question. If that value exists, then, unless it is exempt, it should bear its just proportion of taxation.

It is conclusively shown in this case that the entire assessed value of the physical or tangible property of the respondent was approximately $9,000,000. The statutes of this state require assessing officers to assess property at its fair market value. The presumption is that such officers perform the duties required of them by statute, and in this case no effort has been made to rebut that presumption. We have a right to assume, in the absence of proof to the contrary, that the laws of other states are the same as the laws of this state. Accepting, however, the testimony offered by respondent that the assessed value of the property owned in other states varies from 50 to 65 per cent. of its actual value does not aid it any in its effort to prove that no such thing as intangible property exists or belongs to the respondent company. The total assessed value of the respondent's property in the three states other than Utah is approximately $3,000,000. Conceding that this assessment should be increased 40 per cent. to obtain the actual value of the property would make the total value of the physical property of the company not to exceed $11,000,000. The evidence of the vice president is positive, and it is not disputed, that in the revaluation of the assets of the company, made in the early part of 1917, the committee on appraisement made what he designated a conservative

valuation, and one upon which the company was paying, and, in the judgment of the committee, ought to be able to pay, a reasonable dividend. The testimony is that the company paid such dividends in the years 1917 and 1918.

There appears to be no difference in principle between the property designated intangible property in this case and the property considered by the Supreme Court of the United States in the *Express Co.* Cases, 166 U. S. 185, 17 Sup. Ct. 604, 41 L. Ed. 965. There the court said:

"The first question to be considered therefore is whether there is belonging to these express companies intangible property—property differing from the tangible property—a property created by either the combined use or the manner of use of the separate articles of tangible property, or the grant or acquisition of franchises or privileges, or all together. To say that there can be no such intangible property, that it is something of no value, is to insult the common intelligence of every man. Take the Henderson Bridge Company's property, the validity of the taxation of which is before us in another case. The facts disclosed in that record show that the bridge company owns a bridge over the Ohio, between the city of Henderson in Kentucky and the Indiana shore, and also 10 miles of railroad in Indiana; that that tangible property—that is, the bridge and the railroad track—was assessed in the states of Indiana and Kentucky at $1,277,695.54, such, therefore, being the adjudged value of the tangible property. Thus the physical property could presumably be reproduced by an expenditure of that sum, and if placed elsewhere on the Ohio river, and without its connections or the business passing over it or the franchises connected with it, might not of itself be worth any more. As a mere bridge and tracks, that was its value. If the state's power of taxation is limited to the tangible property, the company should only be taxed in the two states for that sum, but it also appears that it, as a corporation, had issued bonds to the amount of $2,000,000, upon which it was paying interest; that it had a capital stock of $1,000,000, and that the shares of that stock were worth not less than $90 per share in the market. The owners, therefore, of that stock had property which for the purposes of income and purposes of sale was worth $2,900,000. What gives this excess of value? Obviously the franchises, the privileges the company possesses—its intangible property. Now, it is a cardinal rule which should never be forgotten that whatever property is worth for the purposes of income and sale it is also worth for purposes of taxation."

It is not shown in this case that the respondent company

has or holds any special or other franchises not held by other corporations. It is shown, however, that the unity of ownership and the unity and correlated use of its various manufacturing plants have created a species of property valuable in the markets of the country and also valuable for the purposes of producing an income. Manifestly, it can be of no concern to the state how this property, or any property, came into existence. If it is found and has a value, and is capable of having a situs, then it must be a subject of taxation.

It is suggested in the argument that the Constitution expressly exempts corporate stock from taxation where the property belonging to the corporation has been taxed; that it is undisputed in this case that the physical property of the respondent company has been taxed in the several taxing districts where the same is located, and the taxes paid; that the effort on the part of the taxing officials to assess and tax this intangible property, which is represented by the market value of the stock, is an indirect method of assessing such stock, and that such assessment is contrary to the spirit of the Constitution. Evidently it was not the intention of the Constitution makers to permit any property to escape taxation. On the contrary, it was doubtless the intent to prevent double taxation. The certificate or share of stock represents the interest of the holder in the assets of the company or corporation issuing it. If the property represented by such share of stock has been assessed, then the Constitution prohibits taxing the stock. If the value of the physical or tangible property, as it does in this case, falls short of the market or earning value of the corporation, then it must follow that, unless there is some method by which that property can be taxed, it will escape taxation. The mandate of the Constitution is that all property, unless exempt, shall bear its pro rata share of taxation.

In a case decided by this court soon after the adoption of our Constitution, namely, *Judge* v. *Spencer*, 15 Utah, at page 249, 48 Pac. at page 1099, it was said:

"The presumption is that all exemptions intended to be granted were granted in express terms. In such cases the rule of strict construction applies, and, in order to relieve any species of property

from its due and just proportion of the burdens of the government, the language relied on, as creating the exemption, should be so clear as not to admit of reasonable controversy about its meaning, for all doubts must be resolved against the exemption. The power to tax rests upon necessity, and it is essential to the existence of the state."

In the argument of this case much is said concerning the mental processes by which the assessor arrived at the value of this intangible property. It is contended that it had no existence, and for that reason the officer did not consider or have any data upon which to act in concluding that it does exist and in fixing the value thereof. As stated elsewhere in this opinion, in the early part of 1917 the officers of respondent issued a financial statement in which it is made to appear that the assets of the company exceed in value the sum of $26,000,000. That statement mentions and details only tangible or physical property. The assessor had that statement before him at the time of making the assessments in controversy. It is insisted that, inasmuch as that statement mentions tangible property, and tangible property only, there are no reasons or grounds for deducing the conclusion that intangible property existed in addition to such tangible property. The contention of counsel is negatived largely by the testimony of the vice president that in arriving at the value of the property of the corporation the committee considered, not only the physical property itself, but its productivity, the dividends that the company had been able to pay and what, in the judgment of the committee of appraisers, it ought to be able to pay in the future operation and use of such property. This witness was one of the appraisers, and had been general manager of the company for a period of 28 years. It is also testified by the same witness that the committee did not deem it necessary to visit or make a physical inspection of the property, but arrived at its value largely by considering "the stock sheets of each factory, carefully considered them, then united them as a whole, and revalued the whole assets to the extent of $5,392,735." It is therefore apparent that in making this revaluation and in the preparation of the financial statement the committee was influenced

as much by the earnings of the corporation and the market value of its stock as by actual cost and value of the physical or tangible property. Intangible property, necessarily, is not real estate, dry goods, or property of that nature. If such, it would no longer be intangible. It would constitute property capable of being seen. The management, the amount or nature of the business, are all elements that of necessity enter into the market value. It needs no argument to convince any one that the management and good will have as much influence in creating the market or earning value of property as the tangible property itself. Recent history of industry in this state has made such fact a matter of common knowledge. The testimony of the assessor is that in making these assessments and arriving at the amount designated personal property, and which is referred to in the argument as intangible property, he had before him and considered, not only the financial statement prepared by the respondent company, but the dividends paid in past years, the market value of the stock, the assessed valuation of the company's physical property in this state and in other states, and from such data he concluded that the respondent company owned and possessed other property in addition to that assessed in the various counties where its property is located to the extent of the amount of the assessment in question.

The statutes of this state nowhere prescribe any rule for ascertaining the value of any property for the purposes of taxation, and nothing is found therein save the general law that all property not exempt "must be assessed at its full cash value." The method or means employed by the assessor in determining the cash value of the particular species of property here involved seems to have been reasonable and one that would naturally suggest itself. The result arrived at by the assessor conforms to and is supported by the testimony. No other or different method by which the value could be ascertained with any greater degree of certainty is suggested by respondent. The means or method, in its final analysis, is the common-sense one of deducting from the whole of the market value of the assets of this corporation

the assessed value of the physical or tangible property fixed by the various assessors, and concluding that the difference represents the value that had not been assessed. ·The assessor was not without authority to support him in his method of arriving at the value of this property. *Adams Express Co.* v. *Ohio,* 65 U. S. 194, 17 Sup. Ct. 305, 41 L. Ed. 683; *State* v. *Wells Fargo & Co.,* 38 Nev. 505, 150 Pac. 836; *State* v. *Duluth G. & W. Co.,* 76 Minn. 96, 78 N. W. 1032, 57 L. R. A. 63; *City of Los Angeles* v. *Western Union Oil Co.,* 161 Cal. 204, 118 Pac. 720; *Crocker* v. *Scott,* 149 Cal. 575, 87 Pac. 102; *Louis. & Nash. R. Co.* v. *Greene,* 244 U. S. 522, 37 Sup. Ct. 683, 61 L. Ed. 1291, Ann. Cas. 1917E, 97; *Porter* v. *R. R. I. & St. L. R. Co.,* 76 Ill. 561.

It is conclusively shown by the record that respondent owned and was possessed of property largely in excess of the assessment of its physical property in the year 1918; also that such property consisted almost wholly of the benefits or profits resulting from the combined use of the various factories of the respondent; that such property had value both in the markets and as a dividend producer to the owners equal to or in excess of the assessment in question. I can see no escape from the conclusion that the finding of the court that the respondent had no such property as·was attempted to be assessed cannot be upheld.

The tax record designates the property in question personal property. It must be so named under the statute. Manifestly, it does not have a physical existence or situs such as horses, cattle, notes, bonds, and that great mass of property known generally as personal property. This intangible property has not, and cannot have, any existence except as it is in some way related to or connected with the physical property of the corporation. In this case, whatever intangible property there is exists by reason of the earning power of the physical property as directed and operated by the respondent company. It is a reasonable presumption that each factory contributes its pro rata share of the wealth founded upon the producing power of all the plants. In no other way can anything approaching a rational or equitable adjustment

or distribution of this species of property be found. It is the combined product of all the factories, coupled with the management, that makes the earning power and gives value to the corporate assets. To detach this intangible property from the localities where it is produced and give it an existence and location at some other place is manifestly unjust, and not based upon any sound legal reason or principle. Let us suppose that this company had no factory or other property in Salt Lake county save its office furniture, where its general office is located. Could it with any degree of consistency be claimed that simply because the principal office and general place of business is located in such county that that fact alone controls the situs of the property that exists only in connection with its various plants in different counties and in different states? The difficulty of adjusting or prorating this intangible property when it is found to exist among the several plants producing it ought not to defeat an effort on the part of the taxing officers to tax it wherever it is found. The same data that the assessor of Salt Lake county had before him in making the assessment in question would enable the assessors of other counties to ascertain the value of such property and its pro rata share to be assessed in each of such counties.

The existence and situs of the intangible property of a corporation such as the respondent can only be supported upon the same principle that intangible property is found to exist and is assessed against express companies and such like corporations. It is the producing power growing out of the unity of use. If the same principle is involved the same rule that is laid down in the *Express Company* Cases, supra, as to the situs of the property should control in this case. In *State* v. *Wells Fargo & Co.*, supra, the court says:

"Since the decisions of the Supreme Court of the United States reported in 165 and 166 U. S. Reports, cited supra, it has been the settled law in this country that the property of an express company doing both an interstate and intrastate business is in character, both tangible and intangible; that such property may be subject to assessment and taxes; and that the situs of this intangible property

is distributed wherever its tangible property is located and the work is done."

Among other authorities relied on by appellants to support the contention that the situs for taxation purposes of this property is in Salt Lake county are: *Union Transit Co.* v. *Connecticut*, 199 U. S. 194, 26 Sup. Ct. 36, 50 L. Ed. 150, 4 Ann. Cas. 493, and *Hawley* v. *Malden*, 232 U. S. 1, 34 Sup. Ct. 201, 58 L. Ed. 477, Ann. Cas. 1916C, 842. It is insisted that the language used by the court in those cases implies that intangible property has its situs for taxation purposes at the residence of the owner. It is quite evident, however, that the court in those cases was not considering the particular kind of property involved here. The court in *Union Transit Co.* Case, 199 U. S. at page 208, 26 Sup. Ct. at page 39 (50 L. Ed. 150, 4 Ann. Cas. 493), in considering the technical maxim that the situs of personal property is where the domicile of the owner is found, says:

"This rule is doubtless true as to intangible property, such as bonds, mortgages and other evidences of debt."

Here the intangible property manifestly does not consist of notes, mortgages, or other evidences of debt, but partakes wholly of the same nature of property considered by the Supreme Court of the United States in the *Express Company* Cases elsewhere in this opinion referred to. The producing or earning capacity of the corporation and the market value of the capital stock constitute the intangible property in question here, and its situs cannot be controlled by the location of the principal office, but must be "distributed wherever its tangible property is located and the work is done." *State* v. *Wells Fargo & Co.*, supra. The power of the state to define the situs of any property for purposes of taxation located within its boundaries is not here involved. The statute is that "all taxable property must be assessed in the county, city, town, or district in which it is situated."

I am of the opinion that the record supports the contention that the respondent company owned and should be chargeable with intangible property of the value of the assessment here in question. I am, however, of the opinion that only

such prorata share of that intangible property is subject to taxation within Salt Lake county as the taxable value of its tangible property located in that county bears to the total taxable value of all the physical or tangible property of the respondent company in the various taxing districts where such physical or tangible property is located.

It is contrary to every fact proven by this record to argue that the value of respondent's several manufacturing plants is not increased or affected by the combined ownership and unity of operation of its factories. The market value of the stock, income and revenue derived from the productivity of the several factories to a very large extent depend upon such combined use and ownership. The testimony, without a dissenting note, indicates no other or different conclusion.

As I understand the views of the court as expressed by Mr. Justice Frick in his opinion, it is conceded that, if intangible property actually exists in this state, it is the subject of taxation, but that in the absence of legislative direction it cannot be taxed as separate and independent property. It is also conceded in that opinion that—

'All of the things last above enumerated [good will, earning capacity, the productiveness of the property and the actual earnings] which may influence or enhance the actual value of the tangible property, not only may, but should, be considered by the assessing authorities in arriving at the actual value of property for taxation."

No good reason is suggested in the opinion of the court, or by any authority cited, why property so existing should not be taxable and its value ascertained by the method adopted by the assessor in this case. By what other or different scheme the assessing officials could ascertain the pro rata share of intangible property to be assessed against any particular factory is somewhat indefinite. Apparently the opinion proceeds upon the theory that in this case intangible property is shown to exist, and, further, that it can and should be assessed, but that the increased value must be added to the actual value of the physical property. That is to say, it being conclusively established that the respondent is possessed of intangible property, in an effort to ascertain the situs of such property, or any part of it, it will become in-

cumbent upon the taxing officials in each taxing district to determine what part has been produced or created by the physical property situated in that particular taxing district, and then add such amount to the value of the physical property. It is not suggested just how such method or system of assessing can be applied in a practical way. It would seem to be wholly impossible of any practical result. . Such a method is open to the objection stated by Mr. Justice Thurman in his dissenting views expressed in the former decision, to the effect that the effort to tax property upon the basis of what its produces and the income derived therefrom is nothing more or less than an income tax—a tax not authorized by the law of this state. The method employed by the assessor in making the assessment in question is a reasonable one, and is supported by authority. It has the further and additional merit of being as nearly fair and uniform as any method or scheme possible. Absolute uniformity is not attainable in assessing property for the purpose of taxation. The method which was adopted by the assessor in this case to ascertain the value of the property sought to be assessed is not only fair, but workable and easy of application. The Constitution of the state directs that all property within the state not exempt shall be taxed. Admittedly, intangible property is shown to exist in this case. It is not exempt. *A fortiori,* it should be taxed "The cardinal requirement is that, as property, they shall be taxed. All else is matter of method and detail." *State v. Anderson,* 90 Wis. 562, 63 N. W. 748.

Prorating intangible property for the purpose of assessment and taxation is expressly recognized and approved by the Supreme Court of the United States in the *Express Co.* Cases, supra; also in *State v. Wells Fargo & Co.,* supra. In the prorating of the tax in those cases the question, of whether the particular property assessed had produced its share of the intangible property was not controlling, in fact it does not seem to have been considered. As I have hereinbefore stated, it is a reasonable presumption that each factory contributes its pro rata share of the wealth founded

upon the producing power of all the plants. In any event, the presumption of law is always in favor of the tax, not only as to its regularity but as to its legality. If, therefore, the Salt Lake factory did not contribute its pro rata share in producing this property, it was incumbent upon the respondent to show such fact. It made no attempt to do so.

The opinion of the Supreme Court of the United States in *Delaware, L. & W. R. Co.* v. *Pennsylvania,* 198 U. S. 341, 25 Sup. Ct. 669, 49 L. Ed. 1077, is cited in support of the contention that an assessing official cannot look to property in another state for the purpose of ascertaining or establishing the value of property in the taxing state. In that case, as pointed out by the Supreme Court of the United States in a later case (*Hawley* v. *Malden,* 232 U. S. 1, 34 Sup. Ct. 201, 58 L. Ed. 477, Ann. Cas. 1916C, 842), the court was considering tangible property and not intangible property, as in this case. Moreover, the assessor considered the value of the property outside of the state for the purposes of ascertaining: First, if the property sought to be taxed actually existed; and, second, the value of such property within the state. The authorities seem to sustain him in so doing. *Wallace* v. *Hines,* 253 U. S. 66, 40 Sup. Ct. 435, 64 L. Ed. 782, cited in the majority opinion.

The right of taxing officials to consider the business of a corporation beyond the boundaries of the state levying the tax and fixing the value of the property within the taxing state is recognized by the Supreme Court of California in a recent case (*People* v. *Ford Motor Co.* [Cal. Sup.] 204 Pac. 217). In that case the franchise of the motor company to do business in the state of California had been assessed for taxation. The eighth headnote, which reflects the opinion of the court, is as follows:

"Determination of the value of a franchise of a foreign corporation for taxation purposes, by deducting from the value of its total assets the value of its tangible property and fixing the value of the corporate excess in the state at that percentage of the difference represented by the ratio between the intrastate and total business, *held* not violative of the interstate commerce clause (Const. U. S.

art. 1, § 8), or Fourteenth Amendment of the United States Constitution, nor arbitrary or unreasonable."

The fact that the assessor in the instant case placed upon the tax rolls of Salt Lake county a greater valuation of the property sought to be taxed within that county than is fairly chargeable against the respondent ought not to work an annulment of the whole tax. The combined ownership and use of respondent's factories has brought into existence property valuable in the marts of trade and as an income producer. Under the authorities and the mandate of the Constitution such property is liable to taxation, and should bear its proportion of the burden of government. "Now, it is a cardinal rule which should never be forgotten that whatever property is worth for the purposes of income and sale it is also worth for purposes of taxation." *Express Co.* Cases, supra.

I concur in the affirmance of that portion of the judgment of the lower court from which the respondent appeals. I withhold my concurrence in the order affirming the remaining portion of the trial court's judgment.

WEBER, J., concurs with GIDEON, J.